Bar No. 137804

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| OMNIREPS, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No.:** |
| | ) | |
| v. | ) | **Judge:** |
| | ) | |
| CDW CORPORATION; CDW, LLC; | ) | **Magistrate Judge:** |
| CDW GOVERNMENT, LLC; JOHN | ) | |
| COLEMAN; MATT TROKA; | ) | |
| BYRON HOLDEN; TOM CAHILL; | ) | ***JURY TRIAL DEMAND*** |
| TOD LICHNER; and MATT | ) | |
| MCCORMICK, | ) | |
| | ) | |
| *Defendants.* | ) | |

## VERIFIED COMPLAINT

NOW COMES Plaintiff, OMNIREPS, LLC ("Plaintiff"), by and through its attorneys of record, WATSON CONSULTING & COUNSEL, with its Complaint against CDW CORPORATION; CDW, LLC; CDW GOVERNMENT, LLC; JOHN COLEMAN, MATT TROKA, BYRON HOLDEN, TOM CAHILL, TOD LICHNER AND MATT MCCORMICK (collectively "Defendants") and in support thereof, allege:

## JURISDICTION

This Court has subject matter over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332. The amount in controversy exceeds $75,000. Plaintiff is a Florida company with headquarters in Florida, and is domiciled in County of Lee, State of Florida. Defendants CDW Corporation, CDW, LLC, and CDW Government LLC (collectively "CDW") are Illinois companies with headquarters in Illinois, and are all domiciled in County of Lake, State of Illinois. Individual Defendants, John Coleman ("Coleman"), Matt Troka ("Troka"), Bryon Holden ("Holden"), Tom Cahill ("Cahill"), and Tod Lichner ("Lichner"), are residents of and domiciled

1

in the State of Illinois. Individual Defendant Matt McCormick ("McCormick' is a resident of and domiciled in the State of California. Further, disputes within this matter require this Court's jurisdiction arising under 15 U.S.C. § 1121.

## STATEMENT OF FACTS

1.  Todd Ferguson ("Ferguson") is a successful businessman who, through his company, Omnireps, LLC, ("Plaintiff"), sells computer and technology products in the multi-billion-dollar computer industry. Ferguson and Plaintiff entered profitable contractual relationships with several businesses, including but not limited to, Addon Computer Peripherals ("Addon"), Redwave Optics, Belkin, 3M, Liquid PC, and AB Distributing to sell various products within the industry.

2.  CDW is the largest multi-brand computer reseller in the World. In reaching its success, CDW, through its agents which include the named individual Defendants in this instant matter, fosters an arrogant corporate culture of fraud and deceit, greed, graft, and price control in its business operations. As the monolith in the industry, CDW demands compliance with several forms of extortion from its business partners to begin or continue to do business with CDW.

3.  Coleman, Troka, Holden, Tom Cahill, and McCormick are currently, or were at all relevant times, executives of CDW and directly controlled nearly all decision making and actions, both internally and externally, of CDW. These individuals, with the assistance and encouragement of Lichner, attempted to use their power within the industry to force Ferguson and his businesses out of the industry and were successful in causing Ferguson economic and reputation damages.

4.  Coleman and Troka conceived and executed a scheme to fraud Ferguson. They did so by first conspiring with Ferguson's most valued business partner, McCormick, and Ferguson's other

employees to mutiny and steal Ferguson's company, trademark, and software (known by the name of Mindshare), which Ferguson developed over a twenty (20) year period. Coleman and Troka used CDW's power in the industry, and their power within CDW, to effectively coerce Ferguson's business partners to terminate their relationships with Ferguson and his company, Plaintiff. Coleman and Troka did so in their concerted attempt with McCormick to force him out of the computer industry so that CDW may profit off Ferguson's company, trademark, and software, in furtherance of CDW's desire to monopolize the computer resell industry.

5. Penultimately, Ferguson was placed on what is known within the industry as the "Matt Troka Kill List" (synonymous to the common term "blacklisted").[1] Upon placing Ferguson on this "Kill List," Defendants continuously defamed Ferguson and disparaged Plaintiff in their quest to destroy both Ferguson and Plaintiff.

6. In concert with McCormick, Coleman and Troka contacted and poached Plaintiff's business partners including: Redwave, Belkin, 3M, Liquid PC, and AB Distributing. When contacting Plaintiff's aforementioned business partners, McCormick, Coleman, and Troka defamed Ferguson with statements they knew to be lies. McCormick, Coleman, and Troka made the false statements for the purpose of interfering with Plaintiff' business contractual, and otherwise, relationships. They then threatened to blackball those companies from doing business with CDW if they continued working with any company associated with Ferguson.

7. Redwave, Belkin, 3M, Liquid PC and AB Distributing all terminated their contractual relationships with Plaintiff and Ferguson as the direct result of the Defendants' defamatory statements, threats, and coercion.

---

[1] All allegations made herein this Complaint are based upon information and belief. Plaintiff will further substantiate their allegations upon the opportunity to conduct discovery.

## RELEVANT FACTUAL BACKGROUND

8.   Ferguson initially worked for CDW for eleven (11) years, ending in the year 2005 to start his own businesses.  During Ferguson's tenure with CDW, Ferguson won over 200 sales awards in recognition of Ferguson's achievements as the superior CDW Account Manager. Ferguson's tenure also included multiple CDW President's Achievement Awards for CDW's top profits earned by Ferguson for the company.  Ferguson is still known by CDW veteran account managers as "The Legend."

9.   After parting with CDW, Ferguson founded Plaintiff with the guidance of John Edwardson, CEO emeritus of CDW, to set out and capitalize on what is now a multi-billion-dollar segment of the computer industry known as "transceivers," aka "optics."  At the inception of Plaintiff, Ferguson intended to educate, and benefit, CDW of the vast profit potential CDW was missing in the optics' segment of the industry.  Ferguson succeeded in that goal by working closely and amicably with CDW'S account managers, and CDW is presently profiting from Ferguson's industry and labor.

10. In 2010, Ferguson, through Plaintiff, developed a line of optics under the brand name and trademark "Proline."  Ominreps contracted with a fledgling company named Addon, which was owned and operated by McCormick.  The agreement called for Addon to provide the distribution of Ferguson's Proline brand in conjunction with Ferguson marketing the brand to CDW.

11. Capitalizing on his extensive knowledge and contacts at CDW, and in the general industry, Ferguson entered a unique contractual relationship with CDW wherein CDW would buy his Proline brand exclusively and sell his products to its customers.  Proline experienced explosive growth as the fastest growing and most profitable brand in the history of CDW. Proline

4

grew from zero in 2010 to nearly $11 million in annual sales, with approximately $8 million in gross profit, in less than five years.

12. Proline was recently sold by McCormick Addon as part of a package of optics companies for $715 million to Amphenol Corporation. Proline and Plaintiff' software products, Mindshare, Officeshare, and Capacity on Demand (collectively "Mindshare") were the driving components that induced and incentivized the sale. McCormick is reportedly looking at a profit payout of approximately $250 million from the sale of the company McCormick stole from Ferguson. McCormick is now bragging that he "now flies private."

13. In March 2010, Ferguson met with Holden and Cahill and introduced to CDW the unrealized value of selling not only his Proline brand, but multiple additional products into the network optics category. Ferguson explained that CDW was missing a minimum of ten (10) percent of all Cisco and other OEM annual sales. At that time, optics averaged ten (10) to twenty (20) percent of CDW's Cisco orders. This represented $300 to $400 million in lost revenue opportunities from Cisco alone. A subsequent internal report by CDW recognized CDW's prior ignorance in this category.

14. Ferguson later met with Troka in 2014 and conducted a personal presentation which reinforced to CDW of the power of Mindshare and how it would be critical to the exponential growth of sales of every brand sold by Plaintiff to CDW, specifically underserved categories with unusually high margin products.

15. Based upon Ferguson's multitude of time and effort training the salespersons – account managers – of CDW, on the margins they could personally earn by selling Proline over other optics brands, Proline's profits became unparalleled versus all other optics brands sold by CDW.

16. On August 22, 2011, Coleman manipulated the internal CDW procedure known as a "3-

Digit Code" to take credit for the Ferguson's Proline brand. With Coleman's manipulated updates, Proline then became an official vendor of CDW.

17. On April 10, 2012, Coleman recognized the massive growth of the sale of optics by Proline over other optics brands sold by CDW. He wrote to Ferguson that "Proline did $59k with CDW in 2010, $2.1M in 2011 and are on pace to do over 5.5m in 2012. Great growth! You've done an awesome job and we appreciate it. – John Coleman."

18. Ferguson's company, product, and impressively dedicated work paid off. Proline was extremely successful with a vertical growth trajectory; however, Coleman's greed and jealousy changed Ferguson's fate with Proline as Coleman insidiously began his Vendetta against Ferguson. Based on his thirst to take credit for the rapid growth of the sale of optics at CDW, Coleman's growing jealousy of Ferguson and his general dislike of Ferguson, Coleman invited a competitive brand of optics to CDW to compete with Plaintiff' Proline brand. This competitive brand was a start-up company was known as Redwave.

19. In January 2013, Coleman set up Redwave as an optics vendor at CDW. When Coleman was asked internally about this unusual tactic, which had no business logic, Coleman explained: "Because I do not like Ferguson."

20. Despite having no prior customers or sales at CDW, nor anywhere, Coleman provided Redwave with unprecedented access to CDW account managers, customers and other tools in an attempt to destroy Proline and replace the brand with Redwave.

21. Despite being profit detrimental to his own product category at CDW, Coleman went so far as to artificially price Redwave's products to intentionally undercut Proline. Additionally, Coleman promoted Redwave with practices and selling tools normally reserved for vendors which grovel to CDW's so called "marketing spend."

22. Coleman allowed Redwave's salespeople to "walk the floor" at CDW's headquarters; allowed Redwave to "spiff"; allowed Redwave's salespeople to spam CDW account managers (strictly prohibited conduct at CDW); and manually stocked Redwave's products in CDW's warehouse.

23. All of the disparate treatment created vendor competition and resulted in "share shift" at CDW, a phenomenon at CDW which defies pure business logic and is against the CDW business model. Share shift is essentially an internal taking of business away from one vendor and giving to another which does not result in increased profitability.

24. To compete with Coleman's intentional taking of business from Plaintiff' Proline, Ferguson repeatedly requested fair treatment and paid exorbitant "Silver Level" marketing fees to CDW with hopes of elevation to "Gold Level" status, an expensive privilege at CDW which would provide him some of the benefits freely given to Redwave by Coleman. Coleman refused to provide Plaintiff with the same benefits, despite past record-breaking success, because Coleman's scheme was to replace Proline with Redwave. Coleman repeatedly told Ferguson, "You'll never be gold." This statement was made despite the exclusivity that CDW had with Ferguson's Proline and the lack of outside sales Proline was able to make.

25. In March 2014, Coleman lied to his boss, Troka, that Proline was sending gift cards to CDW account managers, a prohibited practice at CDW as CDW did not enjoy its cut of this graft. No evidence exists for this intentionally false and defaming accusation, because no such gift cards were ever grafted by Plaintiff nor its employees.

26. Coleman's repeated attempts to leverage Redwave over Proline was doomed to fail, because Coleman was ignorant as to the predominant reason behind the massive success of the Proline brand at CDW: Ferguson's software, Mindshare, and among other things, how it

managed the custom integration of the EDI between Plaintiff and CDW.  Redwave did not have Mindshare.

27. Mindshare is blatantly misused by CDW account managers in their pattern and practice of lies and deceit to their customers in furtherance of the sale of the Proline brand. Ferguson would have exposed this unfair business practice with his expressed intent to take the brand out of exclusivity at CDW and allow CDW's competitors to also sell the Proline brand.

28. Exclusive brands do not benefit the customer in the first instance because the customer cannot obtain competitive or "parity" pricing on an exclusive brand.  Because the sale of the Proline brand is exclusive to CDW, buyers cannot seek competitive bids for Proline from CDW's competitors.  Therefore, CDW is free to manipulate the prices at will against all public policy supported by anti-trust regulation.  Ironically, CDW is proud of Proline's exclusivity.[2]

29. Here, it is not only the exclusivity of the brand that is detrimental to the customer, but it is the intentional misconduct at CDW that is egregious and constitutes unfair business practices.

30. A simple example explains the wrongful conduct which continues today at CDW in every sale of Proline optics:

> When Betty Buyer for any Fortune 500 company, governmental agency, higher educational organization, or non-profit requests a competitive bid for the price CDW is willing to sell her the necessary optics to operate her computer network, the CDW account manager sends her an offer to sell which quotes the price of the Proline brand optics.  If she accepts the offer, she sends an order creating a *written contract* with her company or agency and CDW.  This raises the contractual duty to disclose which arises in every contract. The CDW account manager then surreptitiously calls or writes to the Proline representative and requests a "back-end bid" rebate, known in the law as a kickback, of the cost CDW has either already paid for the optics *now sold* to Betty Buyer if they are presently in stock in CDW's warehouse, or a discount off the cost to CDW, known as a "front-end bid" rebate, if the optics are not yet in stock and must be purchased from Proline.  At the instant the Proline representative sends to the CDW account manager the written

[2] See, https://www.streetinsider.com/PRNewswire/Proline+marks+nine+years+as+CDW+exclusive+partner+for+compatible+optics/17541829.html

agreement for the kickback, the CDW account manager has the legal contractual obligation to disclose to Betty Buyer the massive discount given to CDW on the cost to CDW after the fact. The account manager's failure to disclose this information to Betty Buyer is black letter fraud in the form of deceit under the laws of all states and Federal statute. In the event, Betty Buyer is required in a particular application to use an OEM brand other than Proline, the CDW account manager is trained to convince Betty Buyer to send internally what is known as a "justification letter." This letter justifies to Betty Buyer's company or organization the purchase of the Proline brand. The CDW account manager lies to Betty Buyer regarding the incorrect assertion that the Proline brand is the only option for project.

31. The egregiousness of this conduct is further exacerbated in instances where CDW has entered purchasing contracts with governments or large companies which are price calculated on a percentage over cost basis.

32. CDW has actual and intimate knowledge of this conduct at the highest levels of management. Troka, Holden, and Coleman, all high level executives, are all critical witnesses and participants to these unfair and unlawful business practices.

33. CDW and Addon, with McCormick as the ringleader of the scheme, continue daily to misuse the Federally protected Mindshare and Officeshare software to facilitate and account for the kickbacks. Mindshare creates the bid letters for the requested kickbacks and Officeshare reconciles the books and calculates the kickbacks due and payable to CDW during the previous period.

34. This type of unfair business practice is known as a non-transparent business practice.

35. In addition to the Redwave scheme, Coleman's vendetta was boosted by the use of the CDW partner designation program, colloquially known as "levels."

36. CDW's partner vendors, such as Proline, are assigned a designated level, i.e., Bronze, Silver, Gold or Diamond, supposedly associated with the revenue generated by the vendor for CDW.[3] A CDW partner vendor's designation greatly affects its access to CDW account managers

---

[3] Proline enjoys an office in CDW's headquarters in Chicago to facilitate this scheme.

and customers; thus, it has a profound effect on a CDW partner vendor's revenue for two distinct and critical reasons. First, it provides the ability to "spiff" or bribe the account manager into selling the vendor's brand. Second, it provides the manipulation of CDW's advertised prices.

37. CDW's category managers determine the partner vendors so called "marketing spend" for each vendor designation, i.e., "level." A vendor's set marketing spend is discretionary to CDW with no set parameters as to performance or profit to CDW. Each vendor is dictated annually how much it will spend on marketing its product through CDW.

38. If one does not "pay to play" with marketing spend, the threat is that CDW will elevate another competitor up to the company's designated level or demote the company to the lower level.

39. Coleman oversaw the network communications category, which included the Proline brand. Coleman repeatedly used threats of level status demotion to extort increased "marketing spend" participation from Proline.

40. An additional tactic by CDW was to extort marketing spend from Proline was the manipulation of inventory stocking if a vendor does not "pay to play." This tactic was to lower or eliminate that vendor's inventory stocking levels in CDW's warehouse. Account managers sell what is in stock, so this is a common threat to all CDW vendors.

41. CDW extorted hundreds of thousands of dollars from Plaintiff to maintain and protect Plaintiff' place in the "levels."

42. In addition to the aforementioned extortion, CDW vendors and other business partners – such as distributers - are overtly cajoled to donate millions of dollars annually to the pet charity of CDW's Founder, Michael Krasny: The Center for Enriched Living ("CEL").

43. Coleman and Holden, as well as other highly influential CDW officers, are intricately

involved in CDW's money raising efforts for CEL. At all relevant times, Holden was the president of and served on CEL's board. Holden is now a trustee of same. Tommy Babulous, an executive of CDW's largest business partner and distributer, Ingram Micro, additionally serves on CEL's board.

44. As early as August 9, 2011, Plaintiff was pressured to "donate" to CEL. Ferguson was expected not only to "donate" through Plaintiff, but also to recruit other business partners in the industry, such as Mitsubishi, to "donate" and fund CEL events. Ferguson was repeatedly pressured and harassed by Coleman and Holden to join CEL's board so that Ferguson would convince his many industry contacts to donate to CEL.[4]

45. Plaintiff was further forced to sponsor numerous egregiously expensive golf and other events, and to bring colleagues to also "donate" to CEL. Plaintiff was also forced to commit to a three-year pledge to "donate" to CEL based upon its current outlook related to its business with CDW. Vendor success at CDW is tied to donations to CEL calculated on projected income from CDW.

46. Holden went so far as to coerce Ferguson to commit to "donating" $50,000 under a shell company to obscure where the funds originated.

47. Hundreds of CDW vendors, distributers and other "partners" are threatened and forced to "donate" millions to CEL annually. Partners are coerced to the point of extortion or face consequences, such as level demotion and non-stocking of products.

48. In addition to corporate extortion, rampant graft and bribery occurs daily at CDW for all relevant business "partners." Defendants enjoyed from Plaintiff: Bon Jovi concert tickets for Holden and his family; extravagant limousine and alcohol parties for Coleman; expensive dinners for Coleman and Holden; golf outings for Coleman and Holden; Michael Bublé concert tickets

---

[4]Ferguson resented and resisted the coercive demands.

for Holden's family and friends; and a Babe Winkleman fishing trip for Holden. Vendors are expected to bribe the purchasing, marketing and sales departments at CDW to maintain their company's status at CDW, such as massage gift certificates such as Ritz Carlton Club Level gift certificates. Further, vendors are assigned "food days" to cater lunch and sponsor dinners for the purchasing department to maintain business relationships with CDW.

49. To accomplish Coleman's conspiracy to force Ferguson from the industry, McCormick cajoled and poached Plaintiff' executives, Cory Christie, Drew Murrie, James Siegel and Rich Toner, to mutiny from Plaintiff and work for McCormick at Addon. On December 3, 2015, Plaintiff' executives and employees began stealing Mindshare customer data at the direction of Coleman and McCormick, individually and as agents of CDW.

50. McCormick provided telephones and computers to Plaintiff' executives to assist in the mutiny.

> [you] boys need some new computers? -- Matt McCormick Addon . . . "Hey Cory and James, please email me your Home Office Address so that we can Ship you phones. What about Rich Toner? If included at this time... (*in the conspiracy*) please forward to me too. We will ship once we have addresses... -- Patrick Beard Addon

51. On September 3, 2015, Coleman, Troka, and McCormick colluded to steal the Proline trademark owned by Ferguson. Said Defendants knew this strategy would necessarily force Ferguson out of the industry as CDW was the only reseller of the Proline brand.

52. In furtherance of the conspiracy, on or about September 21, 2015, and with the help of Proline's Vice President of Sales ("Christie"), McCormick was secretly invited to CDW's headquarters to meet with Coleman and Troka to formulate the plan to steal 1) the Proline brand and its trademark; and 2) the Mindshare trade secrets. The first meeting occurred on November 6, 2015.

53. On November 15, 2015, Coleman and Troka met with McCormick at a CDW hosted event in Las Vegas named the Vendor Summit and signed a "*Deal*" whereby CDW would purchase Proline brand optics directly from Addon and terminate CDW's relationship with Ferguson and Omnireps. Cory Christie's admission is self-explanatory:

> Cory:   That afternoon is when Addon in California called me and let me know what is going on. And basically, what they said is: we've been in negotiations with CDW to go direct and not through Omnireps anymore. We've been working with CDW for about a month...month end and we have dealt with everybody from Troka to John Coleman to Byron Holden and they basically you know we explained our situation, we gave them the documentation on things. And they said: "Look there is no reason we need to keep doing the business through Omnireps."

> \*       \*       \*

> Jimmy calls me on Wednesday and explained what had been done. Basically, three things mainly were happening with CDW. All the po's were going to start going to Addon directly. Addon would be doing all the invoicing. The Partnernet was turned off, that's kind of what happened that day, that's why we couldn't get reports that day Partnernet was turned off for Todd. Addon signed a new contract ... Matt Troka signed a new contract with Addon. And part of this deal was that Omnireps ... Addon is firing Omnireps as their marketing firm.

> \*       \*       \*

> And so one thing I'll back up and I'll say when they went to CDW you know not only did CDW agree to do a contract with them they said "look there's a lot of things we didn't't' allow Todd Ferguson to do as a vendor." They said "purely because Todd Ferguson was in charge." They go "if you take over this line... it's ... you know... we" ... Coleman basically told them "I will open up all kinds of new doors that Todd Ferguson never had. I will let you guys walk the floor. We'll set up spiffing. We'll set up a lot of what a gold partner can do and there is a good possibility in the future that, you know, we can make you Gold." But he said "I'm gonna give you all the privileges that Gold has." And just that alone I think all of us know that it gives us the opportunity to really, really grow this business. So that was one thing. Let me go back so these guys told me all of this.

54. Per Addon co-conspirator, Brent Loomis ("Loomis"), Coleman would jettison Proline from CDW and rename the brand if Ferguson refused to concede defeat to the conspiracy and give away his company to Addon. Ferguson was told:

. . . I'd ask you to think wisely about your next move. We can either work this out, or it will spiral to a point that I guarantee will be worse for you than us. I don't mean that to be a threat, but rather an incentive for you to negotiate with us and work it out. We have a signed contract from troka (sic) and we will do what we have to keep the business, regardless of what the brand is called. It doesn't have to come to this. Please think about this over the next day or so???

55. Both Coleman and McCormick knew Ferguson has a special needs son who requires constant care and attention at extraordinary expense. Both Defendants knew that Ferguson had no other significant source of income to protect his son and his family. Coleman knew he could destroy Ferguson in the industry with lies and CDW's influence. Both Defendants preyed on that knowledge and exploited Ferguson's situation. Based upon this undue influence, Ferguson was forced to settle with Addon for a pittance and gave away his life endeavor, Proline.[5]

56. On or about November 11, 2015, CDW began buying Proline directly from Addon.

57. On November 25, 2015, Addon filed its Petition with the United States Patent and Trade Office ("USPTO") to steal Ferguson's trademark to the Proline brand. Thereafter, Coleman, Troka, McCormick and Christie proceeded to execute their aforementioned plan with the assistance and encouragement of CDW's legal department.

58. On the same day Addon's Petition was filed, Ferguson provided to Holden proof that Plaintiff is the rightful owner of the Proline trademark and requested that CDW reconsider its decision to buy directly from Addon until the USPTO rendered a decision on Addon's meritless claim to the mark.

59. On November 30, 2015, Ferguson again wrote to Holden to inquire about the timing of

---

[5] Plaintiff is seeking to void the settlement agreement with Addon based upon the undue influence of the conspirators placing Ferguson under duress to settle; and Addon's material breach in its continued daily use of Mindshare which is prohibited by the agreement.

CDW's decision and explained: "We don't know what to tell reps or our customers. Last day of the month. They are calling. Any idea when you might have some idea CDW's decision?" In response, Holden advised: "I checked with [Coleman] for a status and he will be meeting with me at 1:15pm (ish) to let me know where we are at with the "brand ownership" issue with our Legal team. Will let you know what I hear after that meeting Todd. - Byron Holden."

60. Rather than allowing the USPTO to adjudicate the "legal issue" of trademark ownership, CDW's legal department conducted an "*internal adjudication*" for the parties and determined the issue in Addon's favor without any authority under law by CDW's general counsel at the time, Christine Leahy ("Leahy"), who is now CDW's CEO.

61. The following day, December 1, 2015, CDW notified Plaintiff that CDW had decided officially, "who owns the proline brand . . . CDW will begin procuring Proline products from Addon directly beginning today."

62. On December 2, 2015, CDW subsequently inexplicably blocked Plaintiff' ability to login to the CDW online application, known as "Partnernet," which allows vendors to access critical information to complete sales at CDW. Ferguson paid CDW handsomely for the privilege of using Partnernet not only for use in the sale of his Proline brand, but all the other brands he sold through CDW in his capacity as those companies' manufacturers' sales representative, such as 3M and Belkin.

63. Concurrently with Plaintiff' lockout, Coleman provided McCormick with Plaintiff' login to Partnernet. This opened the door of the vault to McCormick and provided him with access to the Nucleus of Mindshare. McCormick could see not only Plaintiff' customer lists for Proline; but he then had access to the identity of all the CDW account managers -- which had taken Ferguson years with whom to build relationships to sell his brands. This resulted in

unlawful trade secrets.

64. Prior to the conspiracy, Addon never had access to Partnernet until Coleman gave him Plaintiff' credentials, as CDW's business relationship with Proline was always exclusively through Ferguson and Plaintiff. At this time, McCormick learned for the first time of the moving factor behind Proline's success: Mindshare, which McCormick would use the very next day and which McCormick continues to use it to present date in conspiracy with CDW.

65. In addition to providing McCormick with Plaintiff' customer list, account manager and quote data, Coleman also provided McCormick with Plaintiff' EDI Trading Partner ID. This trade secret is a custom integration with CDW developed over numerous years and at a cost in excess of $75,000. Addon and CDW continue to use Plaintiff' trade secret custom EDI on a daily basis.[6]

66. On December 8, 2015, Holden allowed Ferguson to regain access to Partnernet; but for Ferguson's 3M brand only. However, the Economic Espionage had already been completed and the damage was done. Ferguson never regained access to Partnernet for his Proline brand even though Plaintiff still owned the Proline trademark at that time before he was forced to settle under duress.[7]

67. After Coleman succeeded in his initial conspiracy with McCormick and Plaintiff'

---

[6] Plaintiff' CIO at the time will testify: "EDI Transaction Scope - We had a custom integration of EDI to accomplish what we wanted - to represent uncoded inventory as coded parts in hand since they are essentially all the same thing. As such we had a non-standard implementation of EDI when compared to all other trading partners at CDW as it was an integral part of MindShare and its functionality as it related specifically to the sales model that we developed and implemented at CDW and formalized in Mindshare."

[7] This type of conduct is known in the law as economic espionage.[7] During the 2016 session, Congress enacted the *America Invents Act*, and the *Defend Trade Secrets Act* (Pub.L. 114–153) which expanded the Act's scope to provide for civil remedies.)(18 U.S. §1836).

mutinied executives to steal Ferguson's trademark and company, Coleman then conspired to eliminate Ferguson from the industry in entirety. Coleman and McCormick implemented a plan to disrupt Ferguson's remaining business relationships.

68. After McCormick and CDW stole Proline, Ferguson aggressively focused on increasing sales for his other sales representative clients and developed new partnerships with other vendors looking to grow their businesses in the direct market reseller/value-added reseller channel.

69. Ferguson subsequently contracted with his former competitor, Redwave[8], to serve as its primary sales and marketing representative. The partnership proved successful and Redwave's sales and quote volumes dramatically increased because of Plaintiff' use of Mindshare.[9]

70. Ferguson also focused on his Belkin and 3M brands and began doing business with Liquid P.C. and AB Distributing, two small distributors selling into CDW. Upon learning of these business partnerships, Coleman sought once again to continue his personal crusade against Ferguson. Coleman then recruited former fellow CDW co-conspirators Troka and Holden, and in a new conspiracy with CDW executive, Cahill, set out to undermine and destroy Plaintiff' remaining business relationships.

71. Coleman, Troka, Holden and Cahill began directly and indirectly informing Plaintiff' business partners that they would be blackballed from CDW if they continued business with Plaintiff or Ferguson. Specifically, Coleman, Troka, Holden and Cahill began executing their their scheme as follows.

72. In April 2016, Coleman threw out Redwave as a vendor and blackballed from CDW without explanation. When their nefarious motives became obvious, Cahill temporarily allowed

---

[8] The company Coleman had previously brought in to undercut Ferguson's Proline venture.
[9] Just as it had done with Proline.

Redwave back into CDW in June 2016; however, in September 2016, once appropriate cover had

been established, Cahill and Coleman permanently removed Redwave as a CDW vendor.

73. Coleman used the termination of a few additional handpicked optical brands from CDW

to cover up his misdeeds.  One of the companies inexplicably terminated was Advantage Optics,

a woman owned business start-up with investors from the Pritzger Group.

74. After Coleman removed Redwave for the second time, Coleman, through Cahill,

informed Redwave that CDW would not do business with Redwave if Redwave was also in

business with Plaintiff and Ferguson. As the direct result of the of this coercion, Redwave was

forced to terminate its agreement with Plaintiff.

75. The timing of CDW's hideous conduct was strategically detrimental as Ferguson had

arranged an imminent buyout of Redwave for $25 million, which was ceased when Redwave was

abruptly thrown out of CDW.

76. Defendants then focused on Plaintiff' relations with 3M.  Lichner, at the direction of

Coleman, contacted  Meredith  Blank the national  account  manager  for  3M,  and strong-

armed her to fire Plaintiff as its representative.  Lichner defamed Ferguson and Plaintiff to 3M

by  alleging  that  Ferguson  had  somehow  "broken  into"  Partnernet.   As  the  direct  result  of

Lichner's defamation and coercion, 3M terminated its contract with Plaintiff in November 2016.

77. Similarly, Coleman coerced Belkin to discontinue business with Plaintiff. Belkin

director of sales, Dennis Kondash, admitted to Ferguson that Belkin could not continue in

business with Ferguson because he was on the "Troka Kill List." Kondash is now Addon's vice

president of sales.

78. On July 14, 2016, Barry Bacall from AB Distributing informed Plaintiff' Vice President,

Alan Mashak, that CDW had informed him that in no uncertain terms CDW would not do

business with AB Distributing if Ferguson was involved with the company because Ferguson and Plaintiff were on the "Matt Troka Kill list."

79. Liquid P.C.'s owner, Loretta Sivret, was buying Redwave from Plaintiff and selling Redwave into CDW. After Coleman and Holden contacted Sivret, Plaintiff' relationship with Liquid PC ceased. In a conversation with Richard Bernstein, Sivret's director of purchasing, Bernstein admitted to Ferguson that Sivret could no longer do business with Ferguson because he was now another CDW pariah like Solarflare. Solarflare is another vendor in the industry which found itself on the "Matt Troka Kill list."

## COUNT I: CIVIL CONSPIRACY

80. Plaintiff restates Paragraphs 1-79 and incorporates same herein as Paragraphs 1-79 under Count II.

81. In Illinois, civil conspiracy, is an intentional tort which requires proof that a defendant knowingly and voluntarily participated in a scheme against the plaintiff. *Multiut Corp. v. Draiman (In re Draiman)*, Nos. 05 B 20535, 05 A 01783, 05 A 01784, 2006 Bankr. LEXIS 1243 (Bankr. N.D. Ill. June 22, 2006)

82. Civil conspiracy requires (1) a combination of two or more persons (2) for the purpose of accomplishing, through concerted action, (3) either an illegal object or a legal object through illegal means. *Id*.

83. Each and all the defendants entered an agreement to destroy Ferguson and Plaintiff in the industry by stealing their trademark, trade secrets, optics company -- Proline; and to force Plaintiff out of the industry by defaming Ferguson and Plaintiff, and intentionally interfering with other business contractual relationships with coercion and threats.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for

the following relief:

    A. An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

    B. Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

    C. Statutory interests as provided under law for each cause of action herein this Complaint;

    D. Punitive damages;

    E. Attorneys' fees and costs;

    F. Any and all such other relief that this Court may find just and equitable.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

84. Plaintiff restates Paragraphs 1-83 and incorporates same herein as Paragraphs 1-83 under Count II.

85. To properly plead a tortious interference with a contractual relationship claim, a plaintiff must allege (1) the existence of a valid contract between the plaintiff and a third party; (2) defendants' knowledge of the contract; (3) the defendants' intentional and malicious inducement of the breach; (4) a subsequent breach by the third party due to defendants' wrongful conduct; and (5) damages resulting from the breach. *Rossi Distributors v. Lavazza Premium Coffees Corp.*, No. 01 C 9271, 2002 U.S. Dist. LEXIS 18807 (N.D. Ill. Oct. 2, 2002)

86. Plaintiff alleges that Plaintiff had valid contracts with third parties: Redwave, Liquid P.C., and AB Distributing, at all relevant times.

87. Defendants knew of Plaintiff's contracts with Redwave, Liquid P.C., and AB Distributing, at all relevant times.

88. Defendants intentionally and maliciously interfered with Plaintiff's contractual relationships, inducing and resulting breach by Redwave, Liquid P.C., and AB distributing.

89. Plaintiff suffered damages as a result of Defendants' malicious interference.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for the following relief:

    A.  An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

    B.  Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

    C.  Statutory interests as provided under law for each cause of action herein this Complaint;

    D.  Punitive damages;

    E.  Attorneys' fees and costs;

    F.  Any and all such other relief that this Court may find just and equitable.

## COUNT III: CORPORATE ESPIONAGE

90. Plaintiff restates Paragraphs 1-89 and incorporates same herein as Paragraphs 1-89 under Count III.

91. Defendants partook in corporate espionage by cajoling and poaching Plaintiff's executives: Cory Christie, Drew Murrie, James Siegel, and Rich Toner, to mutiny from Plaintiff and to transition to work under McCormick at Addon.

92. The corporate espionage included the aforementioned individuals stealing Plaintiff's Mindshare customer data.

93. Defendants furthered the espionage by stealing the Proline trademark from Proline.

21

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for the following relief:

A. An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

B. Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

C. Statutory interests as provided under law for each cause of action herein this Complaint;

D. Punitive damages;

E. Attorney's fees and costs;

F. Any and all such other relief that this Court may find just and equitable.

## COUNT IV: MISAPPROPRIATION OF TRADE SECRETS

94. Plaintiff restates Paragraphs 1-93 and incorporates same herein as Paragraphs 1-93 under Count IV.

95. "The first step in proving a violation of the Defend Trade Secrets Act is identifying a trade secret with sufficient specificity to prove it exists. After proving the existence of the trade secret, the party alleging the violation must then establish misappropriation, that is, either the acquisition of a trade secret of another by improper means or the disclosure or use of a trade secret of another without express or implied consent." *JTH Tax LLC v. Grabowski*, No. 19 C 8123, 2021 U.S. Dist. LEXIS 163634 (N.D. Ill. Aug. 30, 2021)

96. Defendants misappropriated Plaintiff's trade secrets by sharing Plaintiff's confidential customer data and Mindshare customer data with third parties, including Addon, through CDW's vendor portal.

97. Defendants, including McCormick and Addon, benefitted from Plaintiff's trade secrets in

using same to generate their own profits and success to the detriment of Plaintiff.

98.  Defendants are presently misappropriating Plaintiff's trade secret and profiting from same.

99.  Plaintiff did not consent to CDW providing third parties with Plaintiff's trade secrets.

100. Defendants act were intentional, deliberate, and malicious.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for the following relief:

A.  An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

B.  Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

C.  Statutory interests as provided under law for each cause of action herein this Complaint;

D.  Punitive damages;

E.  Attorney's fees and costs;

F.  Any and all such other relief that this Court may find just and equitable.

## COUNT V: MISAPPROPRIATION OF TRADEMARK

101.    Plaintiff restates Paragraphs 1-100 and incorporates same herein as Paragraphs 1-100 under Count V.

102.    .Defendants stole and misappropriated Plaintiff's Proline Trademark, resulting in great economic benefit to Defendants and severe financial damages to Plaintiff.

103.    Defendants knowingly, willingly, and wantonly, misappropriated Plaintiff's Trademark.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for

the following relief:

   A. An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

   B. Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

   C. Statutory interests as provided under law for each cause of action herein this Complaint;

   D. Punitive damages;

   E. Attorney's fees and costs;

   F. Any and all such other relief that this Court may find just and equitable.

## COUNT VI: TRADE LIBEL

104.     Plaintiff restates Paragraphs 1-103 and incorporates same herein as Paragraphs 103 under Count VI.

105.     With intent to force Ferguson and Plaintiff out of the industry, Defendants defamed Plaintiff, and libeled Plaintiff, to among others business partners with coercion and threats.

106.     Specifically, Defendants made disparaging statements about and wrongfully lied and accused Plaintiff of stealing information through CDW's Partnernet interface.

107.     These statements were made to Plaintiff's business partners with willful intent to interfere with those business relationships.

108.     Defendants knew their statements were false when made.

109.     Defendants knew and intended that Plaintiff's business partners would rely on said

statements and cause financial loss to Plaintiff by destroying Plaintiff's business relationships with those partners.

110.    Plaintiff's business partners did in fact rely on those tortious statements and ceased to do business with Ferguson and Plaintiff.

111.    Defendants conduct was a substantial factor in causing Plaintiff's harm.

112.    Plaintiff has suffered economic loss as the direct and proximate result of Defendants' tortious and unlawful acts.

113.    Defendants acted willfully and with malice, entitling Plaintiff to exemplary damages.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for the following relief:

A.  An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

B.  Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

C.  Statutory interests as provided under law for each cause of action herein this Complaint;

D.  Punitive damages;

E.  Attorney's fees and costs;

F.  Any and all such other relief that this Court may find just and equitable.


## COUNT VII: 18 U.S.C. § 1962 RACKETEERING

114.    Plaintiff restates Paragraphs 1-113 and incorporates Paragraphs 1-113 herein

under Count VII.

115.      18 U.S.C. § 1962(c) provides that it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

116.      Plaintiff is engaged in both interstate and foreign commerce.

117.      Defendants are engaged in interstate and foreign commerce and are employed by and associated with an enterprise engaged in interstate or foreign commerce.

118.      Defendants directly and indirectly conducted and participated in the conduct of such enterprises' affairs through a pattern of racketeering activity.

119.      Each and all Defendants entered into an agreement to destroy Plaintiff in the industry by stealing its trademark, trade secrets, and optics company; therefore, forcing Plaintiff from the industry by defaming Plaintiff, libeling Plaintiff, and intentionally interfering with other business relationships with coercion and threats.

**WHEREFORE** Plaintiff, Omnireps, LLC, respectfully prays upon this Honorable Court for the following relief:

A.  An injunction restraining CDW and any and all CDW vendors and/or affiliates from the use of Mindshare and from disparaging Plaintiff and Todd Ferguson;

B.  Any and all compensatory damages to be proven at trial, in an amount no less than $250,000,000;

C.  Statutory interests as provided under law for each cause of action herein this Complaint;

D.  Punitive damages;

E.  Attorney's fees and costs;

F.  Any and all such other relief that this Court may find just and equitable.

_steve watson_
steve watson (Feb 13, 2023 12:07 EST)

STEVE WATSON, ESQ.
One of Attorneys for Plaintiff

STEVE WATSON
Watson Law Group
945 McKinney Street Suite 304
Houston, TX 77002
(805) 329-1151
swatson@watsonlawgroup.com
Bar No. 137804

## VERIFICATION

I, Todd Ferguson, owner of Omnireps, LLC, the Complainant named in the foregoing Complaint being duly sworn, says the facts and allegations contained therein are true, except so far as they are therein stated to be on information, and that, so far as they are therein stated to be on information, I believe them to be true.

Date: Feb 13, 2023

Todd Ferguson (Feb 13, 2023 12:09 EST)

Todd Ferguson on behalf of Plaintiff